349 So.2d 276 (1977)
In the Matter of the Succession of Joseph L. ROBINS.
No. 59138.
Supreme Court of Louisiana.
June 20, 1977.
Rehearing Denied September 2, 1977.
Ashton L. Stewart, Laycock, Stewart & Preis, Baton Rouge, for plaintiff-appellant.
Vanue B. Lacour, Lacour & Calloway, Baton Rouge, for defendants-appellees.
TATE, Justice.
May the state validly prohibit an illegitimate child from receiving a legacy intended for him by his father, solely because the child's conception resulted from an adultery committed by the father? Simply stated, that is the issue before this court.
The deceased testator willed his estate, composed entirely of his separate property, to two illegitimate sons. Relying upon Civil Code Article 1488 (1870), his surviving widow by a second marriage opposed the judicial recognition of these legacies. The trial court held the code article to be unconstitutional and, accordingly, dismissed the widow's claim to receive the decedent's estate instead of his testamentary heirs, i. e., his illegitimate sons. An appeal is taken for her claim.[1]
*277 Article 1488[2] prohibits natural parents from giving or willing any part of their estate to their illegitimate children, if these children were conceived as a result of an adultery or of incest. No such prohibition applies to gifts or legacies made by a father to his illegitimate children conceived under other circumstances, at least where (as here) the decedent is not survived by lawful descendants, ascendants, or collateral relations. Articles 1483-87.
The district court held that Article 1488 violates Article 1, Section 3, Louisiana Constitution of 1974[3], in that the code article unreasonably discriminates against adultery-conceived illegitimates solely on the basis of their birth. The constitutional provision states: "No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth * * *."

I.
In this direct appeal to this court from the judgment holding Article 1488 unconstitutional, see La.Const. Art. 5, Sec. 5(D)(1) (1974), the narrow legal issue is:
Does a statute unreasonably discriminate against illegitimate children because of their birth, in violation of our state constitution, when it prohibits a natural parent from giving or willing an illegitimate child any substantial part of the parent's estate solely because the child's conception resulted from the parent's adultery? (The narrowed issue essentially involves the reasonableness of the legislative classification of adultery-conceived illegitimates as being incapable of receiving testamentary dispositions from their parents, when such dispositions are not prohibited as to other illegitimate children, nor as to (technically) "illegitimate" children likewise conceived as the result of an adultery.)
Preliminarily, we emphasize that the present issue does not arise in the context of passing upon the reasonableness of legislative classifications of legitimate versus illegitimate children for purposes of intestate heirship, Articles 886-88, 902, 917-920, nor even for purposes of testamentary succession, Article 1483. Nor does it arise in the context of the legislative reasonableness of the intestate succession of a surviving widow to her husband's property in default of legitimate descendants, to the exclusion of the husband's illegitimate children. Articles 917, 919.
Rather, the issue is narrowed to the reasonableness of a legislative classification by which, solely because his conception resulted from an adultery, an illegitimate child is deprived of any right whatsoever to receive his father's estate should the latter desire to will it to his natural child.
In the present case, for instance, the sons' illegitimacy did not by itself invalidate the legacies by their deceased father to them. The testamentary disposition to these illegitimate sons would have been valid, except *278 for their adulterous conception.[4] Likewise, no statutory bar invalidated the right to the father to make a testamentary disposition of his estate to a third person (rather than to his adultery-conceived children), nor even to the adultery-conceived children of a third person, despite the existence of a surviving spouse (to whom the testator did not wish to will his separate property).
Thus, in all the world, only the children of this father conceived as a result of his adultery are prohibited from receiving his estate if he wills it to themand for the sole reason that their conception was a consequence of his adultery.[5]

II.
Article 1, Section 3, of our state constitution prohibits laws which "unreasonably discriminate against a person because of [his] birth * * *." In the constitutional debates, both proponents and opponents of the provision noted that it included within its scope unreasonable discrimination against persons because of illegitimacy.[6]
The equal protection guarantee of the constitution essentially requires that state laws affect alike all persons and interests similarly situated. Nevertheless, differences in legislative treatment may validly be accorded to persons or interests classified differently, provided there be shown a rational basis for the differentiation which is reasonably related to a legitimate governmental purpose.
See: Williams v. Williams, 331 So.2d 438 (La.1976); State v. Barton, 315 So.2d 289 (La.1975); Petition of Sewerage & Water Bd. of New Orleans, 257 La. 716, 243 So.2d 809, 813 (1971); Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 6-10 (1974). See also: Trimble v. Gordon, 430 U.S. 763, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977).
In the present instance, children were denied by statute the right to receive testamentary legacies intended for them by their father. The sole statutory reason was that, at the time of their conception, their father was married to another woman than their mother, i. e., because their conception resulted from a proven adultery.[7] Except for those conceived of an incestuous relationship, no other illegitimates are so penalized.
The thrust of our analysis must be: What valid state purpose is rationally served by a legislative classification which prevents only illegitimates conceived in adultery from having the capacity to receive testamentary legacies from their father, but (save for incestuous children) does not similarly prevent other illegitimates from doing so?
The valid state purpose said to be served is to help preserve the sanctity of the marriage by penalizing adulteries. Does the denial of any right of the adulterous children to receive legacies provide a rational basis for this differentiated effect accorded these illegitimates and no others?
*279 We find no rational basis for this hence-invidious discrimination against illegitimates solely because their birth resulted from an adultery.
Assuming that adulteries are a social evil that endanger the sanctity of marriages, we note that the legislature has not seen fit to provide sanctions against the adulterous parentsonly against their children. "* * * [V]isiting this condemnation [by society "of irresponsible liaisons beyond the bonds of marriage"] on the head of an infant is illogical and unjust. . . . Obviously, no child is responsible for this birth and penalizing the child is an ineffectualas well as unjustway of deterring the parent." Weber v. Aetna Casualty & Surety Company, 406 U.S. 164, 175, 92 S.Ct. 1400, 1406, 31 L.Ed.2d 768 (1972).[8]
The irrationality of the sanction provided by the legislative classification is highlighted by the arbitrariness by which it is brought into play so as to affect some children conceived of an adultery and not others.
In practical effect, the only adulterous children affected are those born of a married father and an unmarried motherand then only if the father admits his parentage, Article 209(1), (2), or else it be proved that "the mother of the child was known as living in a state of concubinage with the father, and resided as such in his house at the time the child was conceived," Article 209(3), Succession of Cervini, 228 La. 1054, 84 So.2d 818 (1956).[9]
On the other hand, children conceived of other adulterous connections are not practically subject to Article 1488's severe sanctions, which bar some illegitimates and not others from receiving testamentary dispositions from their own parents.
If both natural parents are married to other persons at the time of an adultery, or if an unmarried father has committed the adultery with a married woman, then any child thereby conceived is afforded protection from illegitimate status by the presumption that the husband of the mother is the father of children born or conceived during the marriage. Article 185. This presumption presents what until now has been an almost insurmountable bar to proving that the child's legal parent is not the mother's husband but is instead, the adulterer, Articles 185-90 (as amended in 1976). See Spaht, The Strongest Presumption Challenged, 37 La.L.Rev. 59, 64-67, 83-86 (1976). Children of such adulteries therefore ordinarily escape the sanction sought to be imposed against the present illegitimates, which deprives them alone of the right to receive testamentary legacies intended for them by their fatheressentially because their father claimed them as his own children conceived in adultery.
In the present case, for instance, if the father's ancient adulteries during his childless marriages had been with women separated from (but technically married to) legal husbands, the present father could have willed his property to his biological sons of these liaisons: Technically, they were then not adulterous bastards, but rather were legitimate offspring of their mothers' marriages with their respective husbands.
Thus, under the present circumstances, the deceased father could have willed his *280 estate not only to his own illegitimate children if not conceived in adultery, but also to any other "legitimate" or illegitimate children, whether or not they were conceived in adultery.
Without reaching other contentions of invidious discrimination against adulterous children solely because of their birth, it suffices in deciding the present litigation that we affirm the trial court's holding that Article 1488, by denying adulterous children the right to receive gifts or legacies intended for them by their parent, offends our state constitution's prohibition against unreasonable discrimination against persons because of their birth. This drastic penalty affecting only illegitimates proven to be conceived in adultery is not shown to be supported by any rational basis reasonably related to the governmental interest sought to be advanced by it. In similar context, the United States Supreme Court has observed: "* * * We have expressly considered and rejected the argument that a State may attempt to influence the actions of men and women by imposing sanctions on the children born of their illegitimate relationships." Trimble v. Gordon, 430 U.S. 762, 97 S.Ct. 1459, 1464-65, 52 L.Ed.2d 31 (1977).

III.
In contending that the complete denial of inheritance rights to adulterous children is founded upon a rational basis, the appellant principally relies upon Succession of Vincent, 229 So.2d 449 (La.App. 3d Cir. 1969), certiorari denied 255 La. 480, 231 So.2d 395 (1970), affirmed eo nomine Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971). In that case, no unreasonable discrimination under the federal constitution was found to result from Louisiana's denial to illegitimates of intestate inheritance rights which are granted to legitimate children.
The reliance is misplaced. The issue in Vincent involved the statutory regulation of the distribution of estates of decedents who died without making a will. The rational basis for the discrimination between legitimate and illegitimate children was found to exist in facilitating the prompt and definitive determination of property left by an intestate decedent, as well as in the social policy of encouraging marriage and discouraging illegitimacy.[10]
However valid these may be as rational bases for differentiated treatment of legitimate or illegitimate children for purposes of intestate succession, these reasons do not afford any rational basis to deny completely by statute any right of an illegitimate child to receive a legacy given him by his father's will solely because the child's conception resulted from his father's admitted adulteryespecially where, as here, the father could have willed his estate to non-adulterous illegitimates or to complete strangers.[11]
Our holding that Article 1488 constitutes invidious discrimination against adultery-conceived illegitimates solely because of their birth, where other illegitimate children of the parent are not so penalized, is in accord with similar interpretations of the federal constitution's equal protection guarantees: Trimble v. Gordon, 430 U.S. 763, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977);[12]Weber v. Aetna Casualty & Surety Company, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).[13] See also Warren v. Richard, 296 *281 So.2d 813 (La.1974). However, since we have found that this invidious discrimination is barred by our state constitution, we need not ground our decision upon this additional basis.

Conclusion
Accordingly, we affirm the judgment of the district court, which granted judgment in favor of the decedent's sons and which held Civil Code Article 1488 violated our state constitution by denying the decedent's illegitimate sons the capacity to receive the legacies intended for them by their father's will. All costs to be paid by the appellee.
AFFIRMED.
DENNIS, J., concurs.
SANDERS, C. J., and MARCUS, J., dissent.
SUMMERS, J., dissents and assigns reasons.
SUMMERS, Justice (dissenting).
Decedent Joseph Lee Robins died in East Baton Rouge Parish on July 24, 1975 at the age of 93 leaving substantial property, both real and personal, belonging to his separate estate. He was first married to Fannie Holmes on March 19, 1908. During this marriage the child Ernest James Robins was born on September 21, 1918 of a liaison between decedent and Mamie Hausey. Fannie Holmes died on October 2, 1929. Her succession proceedings disclose there were no children born of her union with decedent, and decedent accordingly was placed in possession of her entire estate.
Thereafter decedent was married to Neonetta Hardnett on January 6, 1931. While married to Neonetta Hardnett a child named James Wilson was born on November 11, 1938 of a liaison between decedent and Dorothy Wilson.
By a statutory last will and testament dated June 12, 1970 and a codicil dated July 17, 1970 decedent bequeathed all of his property to Ernest James Robins and James Wilson, acknowledging by this will that they were his children. On July 17, 1970 decedent executed a notarial adoption of Ernest James Robins and on July 20, 1970 adopted James Wilson in the same manner. La.Rev.Stat. 9:461. These purported adoptions, however, are not relied upon and were ineffective because decedent could not under Louisiana law adopt anyone without the concurrence of his wife. La.Civil Code art. 214.
At the time of his death on July 24, 1975, decedent was survived by his widow Neonetta Hardnett. She intervened in his succession, alleging that Ernest James Robins and James Wilson were adulterine children, that there was no issue of the marriage, and asserting that, as surviving spouse of decedent and his sole heir, she was entitled to be placed in possession of his entire estate. While these proceedings were in progress Neonetta Hardnett died on June 7, 1976, and her sister Deola Hardnett as her universal legatee and sole heir was substituted in her stead.
It is contended on behalf of Neonetta Hardnett's succession that the legacies in favor of Ernest James Robins and James Wilson are absolute nullities upon the authority of Article 1488 of the Civil Code, which provides that: "Natural fathers and mothers can, in no case, dispose of property in favor of their adulterine or incestuous children, unless to the mere amount of what is necessary to their sustenance, or to procure them an occupation or profession by which to support themselves." Since both children are shown by this record to have occupations and to be fully capable of supporting themselves, the alimentary exception to the prohibition against parents disposing of property to their adulterine children is inapplicable to this case.
A plea to the constitutionality of Article 1488 was filed in the trial court on behalf of Ernest James Robins and James Wilson claiming that the article: 1) arbitrarily, capriciously, or unreasonably discriminates against them because of birth and culture contrary to Article I, Section 3, of the Louisiana Constitution of 1974; 2) deprives them of life, liberty and property without due process of law in contravention of Article *282 I, Section 2, of the Louisiana Constitution of 1974; 3) deprives them of life, liberty and property without due process of law and equal protection of laws in violation of the Fourteenth Amendment to the Constitution of the United States; and 4) constitutes a bill of attainder in violation of Article I, Section 9, of the Constitution of the United States.
The trial judge found that Article 1488 was not contrary to the United States Constitution on the basis of the decision of the United States Supreme Court in Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971). He decided, however, that prohibiting a natural father from making a disposition of property to his adulterine children was a clear violation of Article I, Section 3, of the Louisiana Constitution. That article provides:
"No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime."
Based upon the trial court declaration of unconstitutionality, the case was appealed directly to this Court on behalf of the Succession of Neonetta Hardnett. La.Const. art. V, § 5(D)(1).

I.
In my view the trial judge erred in holding Article 1488 to be unconstitutional in contravention of Article I, Section 3, of the Louisiana Constitution of 1974 and this Court's majority erred in sustaining that holding. In an initial and careful analysis of Section 3 this Court noted in State v. Barton, 315 So.2d 289 (La.1975) that the first and second sentences of Section 3 point up the special consideration the framers of the Constitution gave to the third sentence, which is pertinent to this case. By stipulating in the third sentence that no law shall "arbitrarily, capriciously, or unreasonably discriminate" against a person because of "birth", the Constitution does not impose absolute prohibition as it does in the first two sentences of Section 3 which pertain to equal protection, race and religion. Consequently, if there is a rational basis for a birth classification the legislation is not unreasonably discriminatory and meets the constitutional test.
Distinctions based upon sex, legitimacy, minority and mental infirmity were referred to as "natural" distinctions by Domat. See 1 Domat, prel. bk. 2.73. Historically Louisiana has also recognized that rights in property are closely related to the family unit. Stability of the family and certainty of property rights are sought to be protected by the Civil Code. So interrelated with this purpose is the treatment of illegitimate children that our courts have declined attacks upon the elaborate plan regulating family life embodied in the Code.
Illustrations of this complex structure are pervasive in the Code. The class of legitimate children is limited to those who are conceived during the marriage of their parents. All other children are classed as illegitimate, while this class is further divided into numerous subclasses: Those illegitimate children who could not be acknowledged or legitimated, illegitimate children who obtained a judgment of paternity or maternity against the biological parent (La.Civ.Code arts. 208-12), illegitimates who were acknowledged by their biological parent (La.Civ.Code arts. 202-07), and illegitimate children who were legitimated. La.Civ.Code arts. 198-201.
Article 181 of the Civil Code mentions two sorts of illegitimates: "Those who are born from two persons, who, at the moment when such children were conceived might have legally contracted marriage with each other; and those who are born from persons to whose marriage there existed at the time some legal impediment." Into the latter category fall: 1) adulterous bastards, "those produced by an unlawful connection between two persons, who, at the time *283 when the child was conceived, were, either of them or both, connected by marriage with some other person," (La.Civ.Code art. 182) and 2) incestuous bastards, "those who are produced by the illegal connection of two persons who are relations within the degrees prohibited by law." La.Civ.Code art. 183.
Adulterous and incestuous bastards, generally speaking, cannot be acknowledged or legitimated. La.Civil Code arts. 198, 200 and 204. However, there are exceptions. In the case of adulterous bastards, if there is a subsequent legal marriage of the biological parents, after the impediment to the marriage is removed, the child may be acknowledged. La.Civil Code art. 204. If he is so acknowledged, he is automatically legitimated. La.Civ.Code art. 198.
Furthermore, once the impediment to the marriage is removed, a biological parent can in some instances legitimate the child by notarial act. La.Civ.Code art. 200. There is a specific prohibition in Article 198 of the Civil Code against legitimation of incestuous bastards by subsequent marriage of the natural parents.
Under Article 208 an illegitimate who has "not been legally acknowledged, may be allowed to prove" his paternal descent by proof as outlined in Articles 209 and 210. Upon establishing descent, the illegitimate becomes entitled to claim financial support in the form of alimony. La.Civ.Code arts. 240-45.
An illegitimate child who is acknowledged by his natural parent enjoys not only the right to claim alimony from the parent so acknowledging (La.Civ.Code art. 242), but also a restricted right of intestate inheritance. La.Civ.Code arts. 918-19. See 37 La.L.Rev. 59 (1976).
Legitimate descendants always exclude illegitimate descendants in intestate successions. La.Civ.Code art. 902, 915, 918-19. Legitimate descendants and fathers and mothers are forced heirs, but their illegitimate counterparts are not. La.Civ.Code arts. 1493-95. Legitimate ascendants and descendants in need may claim alimony from each other regardless of their abilities to provide for themselves (La.Civ.Code art. 229); illegitimates may claim alimony only if not able to provide for themselves. La.Civ.Code arts. 240-45. On the other hand, illegitimates cannot be said to be without substantial rights. From their mother who has acknowledged them, illegitimate children inherit her patrimony to the exclusion of her surviving spouse and of all relatives other than her legitimate descendants. La.Civ.Code art. 918. From their father who has acknowledged them, they inherit only in the absence of even remote legitimate relatives and a surviving spouse (La.Civ.Code art. 919); but the father may donate to his illegitimate acknowledged offspring up to one-fourth of his patrimony (and sometimes one-third) if he leaves legitimate relations. La.Civ.Code arts. 1486-87. All illegitimates who either have been acknowledged or, being acknowledgeable but not acknowledged, have proven who their parents are, may demand alimony from them. La.Civ.Code arts. 240-45. And, even the unacknowledgeable illegitimate may prove who his mother is, unless she is a married woman (La.Civ.Code art. 212), and may claim alimony from her and her ascendants. La.Civ.Code art. 245. See 46 Tul.L.Rev. 167, 173 (1971).
Considering the attention the drafters of the Code have devoted to this extensive and thorough legal system designed to sustain the family unit, protect the rights of property and accord to illegitimate children some benefits of inheritance, and a measure of support and sustenance, it is inconceivable that these classifications were intended to be abolished by Article I, Section 3, of the Constitution of 1974 as the holding of the trial judge and the majority would require. Reference to the debates at the Convention assures me that such a result was never intended. Verbatim Transcript, Vol. 12, August 29, 1973, pp. 57, 62, 76, 80, 90, 97; also Vol. 37, January 10, 1974, p. 3. It is implicit from these proceedings that the delegates intended that a reasonable classification should be sanctioned by the Constitution, and this Court has so held. See Williams v. Williams, 331 So.2d 438 (La. *284 1976); State v. Barton, 315 So.2d 289 (La. 1975). The classifications established by the Code between legitimate and illegitimate children are part of a logical and rational system. They are reasonably fair and humane. Since Article 1488 is such an integral component of this system the classification based upon birth which it embodies is neither arbitrary, capricious nor unreasonable and it does not offend the Constitution. The continuing legislative approval of these articles of the Code affecting illegitimates is illustrated by repeated rejection of proposals to alter them.
Without any record evidence to support its position, and without setting forth wherein the article of the Code constitutes an unreasonable classification, the majority has declared Article 1488 unconstitutional. In doing so the established doctrine that a presumption exists in favor of validity has been disregarded, a presumption which should be more compelling where the legislation has been an integral part of the body of Louisiana's vital domestic private law for more than 175 years.
Thus the careful deliberation which requires that a court never declare a statute void unless its invalidity is beyond reasonable doubt has been cast aside in this wholesale emasculation of Louisiana's laws affecting illegitimates. For, in my view, all other legislation affecting illegitimates is jeopardized with this decision. Parish of Jefferson v. Sharlo Corp., 283 So.2d 246 (La.1973); Hamilton v. McKeithen, 254 La. 683, 226 So.2d 494 (1969), appeal dismissed 397 U.S. 245, 90 S.Ct. 1104, 25 L.Ed.2d 278, reh'g den. 397 U.S. 1059, 90 S.Ct. 1351, 25 L.Ed.2d 680; Jones v. State Bd. of Ed., 219 La. 630, 53 So.2d 792 (1951); DeFrancis v. City of Bossier, 322 So.2d 333 (La.App. 2nd 1975), writ denied 325 So.2d 611 (La.1976), cert. den. 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81.
Since no contention has been advanced in argument to support the claim that Article 1488 offends the "culture" clause of Article I, Section 3, that part of the plea of unconstitutionality is considered abandoned.

II.
Insofar as the issues before us are concerned the due process and equal protection guarantees of the State and Federal Constitutions are essentially founded upon like principles. These principles limit the passage of legislation which imposes burdens upon or grants benefits to certain groups or classes of individuals without reason. They require that there be some justification in fact for the statutory classification drawn by the legislature to the end that those similarly situated are similarly classified and treated. Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957); see State v. Pebworth, 260 La. 647, 257 So.2d 136, 140-141 (1972).
The test is employed in Section 3 of Article I of the Louisiana Constitution of 1974: that the legislation not be arbitrary, capricious or unreasonable. It must rest upon some ground of difference having a fair and substantial relation to the object to be accomplished so that all persons similarly circumstanced are treated alike. The degree of accuracy required of birth-based classifications may be compared to that applied to sex-based classifications referred to in State v. Barton, 315 So.2d 289 (La.1975). The classification is tested by the traditional standards of review demanding only that there be a rational relation between the classification as drawn and the achievement of a legitimate state objective found to be the purpose of the statute. See Stanton v. Stanton, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975).
Obviously Louisiana's system of testate and intestate succession is not more unfair or discriminatory than the laws of states which permit a man to leave his entire estate to one of his childrenor in some instances to strangersdisinheriting his remaining legitimate children entirely. Where is the rational basis for such a result? What stated purpose does such a system of laws serve? Is it not permissible under such a system for a person to discriminate against his legitimate children in favor of his illegitimate children?
*285 "It is surely entirely reasonable for Louisiana to provide that a man who has entered into a marital relationship thereby undertakes obligations to any resulting offspring beyond those which he owes to the products of a casual liaison, and this whether or not he admits the fact of fatherhood in the latter case. With respect to a substantial portion of a man's estate, these greater obligations stemming from marriage are imposed by the provisions of Louisiana law making a man's legitimate children his forced heirs. For the remainder of his estate, these obligations are not absolute, but are conditional upon his not disposing of his property in other ways." Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971) (Harlan, J., concurring).
In Succession of Vincent, 229 So.2d 449 (La.App.1969), cert. denied, 255 La. 480, 231 So.2d 395 (1970), the Third Circuit held, with the author of the present opinion writing, that within the broad powers of classification invested in the state legislature, there is a reasonable basis for the denial of inheritance to illegitimates equal to that of legitimate children. The opinion continued: A state has a great latitude in regulating descent and distribution, matters peculiarly reserved to the states. United States v. Burnison, 339 U.S. 87, 70 S.Ct. 503, 94 L.Ed. 675 (1950); Harris v. Zion's Savings Bank & Trust Co., 317 U.S. 447, 63 S.Ct. 354, 87 L.Ed. 390 (1943). The classification of illegitimate children in Louisiana law does, in the Legislature's discretion, have a tendency to encourage marriage and to discourage illegitimacy, valid social aims of the state. Since all men must die and leave their property for their successors, the denial of full rights of inheritance to illegitimate children may reasonably be viewed as encouraging marriage and legitimation of children.
I would add to the foregoing, what Louisiana has historically recognized, that the prohibition against incestuous children may reasonably guard against genetic abnormalities in the progeny. In either instance, whether the illegitimacy is adulterine or incestuous, public moral standards are sought to be preservedall legitimate state concerns. The decision today cannot be reconciled with the expressions in Succession of Vincent.
The Third Circuit's holding in Succession of Vincent, supra, was approved by this Court when we denied writs and by the United States Supreme Court in Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971), where Mr. Justice Black as organ of the Court wrote: "[T]he power to make rules to establish, protect, and strengthen family life as well as to regulate the disposition of property left in Louisiana by a man dying there is committed by the Constitution of the United States and the people of Louisiana to the legislature of that State."
Counsel for Ernest James Robins and James Wilson has referred the Court to the recent decision of Trimble v. Gordon, 430 U.S. 763, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977). As we read this decision it does not overrule Labine v. Vincent insofar as the rationale which we adopt for decision of the instant case. In any event the decision in Trimble v. Gordon is prospective in application and cannot constitutionally retroactively divest vested rights. U.S.Const. art. I, §§ 9 and 10; amends. 5 and 14. Here the rights of inheritance have vested to the exclusion of James Robins and James Wilson long before Trimble v. Gordon. I would, therefore, adhere to Louisiana's time-tested code structure until the laws upon which this case rests are specifically abrogated by the Legislature or declared unconstitutional by the United States Supreme Court. In my opinion Article 1488 of the Civil Code does not deny equal protection or due process of law.
While the majority professes to confine the rationale of today's holding to the particular facts of this case, the end result will effectively invalidate all laws of this state based upon illegitimate births. The decision directly invalidates Articles 204, 920 and 1488 of the Civil Code and Section 391 of Title 9 of the Revised Statutes. If I *286 understand the decision today, such a result will follow so long as this majority sits, whether the rights denied illegitimates are based upon a reasonable classification or notthe Constitution to the contrary notwithstanding.
Because the decision fails to declare whether its effect is prospective or retroactive, the titles to properties throughout the State will remain in question until the rights of illegitimates in them are fixed by a court more conscious of the law's stability.
This expansive interpretation of the law by this majority in this and many other decisions and decrees has caused principles and procedures designed to guarantee at least a minimum quality of justice to be abandoned. The resulting judicial proliferation of rights, legal principles and procedures in the legislative domain has cast the people of this State into a deluge of litigation producing a docket which this Court and many other courts of this State can no longer manage. Because of this the burdens the administration of justice has placed upon the taxpayers of this State has become inordinate and will continue. So long as this Court disregards judicial restraint, usurps the legislative, and indeed as in this case constitutional prerogatives, and seeks to impose upon Louisiana its innovative concepts of social and other reforms repugnant to this Nation's fundamental principles, the future holds no promise for a better day.
I would uphold Louisiana's laws of 175 years designed to strengthen and uphold the family unit, a concept which goes to the very fabric of an orderly society.
NOTES
[1] Actually, by the date of the trial judgment the widow had died. The widow's legatee, her sister, is substituted as the party who asserts the widow's claim to receive the decedent's entire estate in lieu of the illegitimate sons to whom he had willed his separate property.
[2] Article 1488 provides: "Natural fathers and mothers can, in no case, dispose of property in favor of their adulterine or incestuous children, unless to the mere amount of what is necessary to their sustenance, or to procure them an occupation or profession by which to support themselves."

See also:
Article 182: "Adulterous bastards are those produced by an unlawful connection between two persons, who, at the time when the child was conceived, were, either of them or both, connected by marriage with some other person."
Article 183: "Incestuous bastards are those who are produced by the illegal connection of two persons who are relations within the degrees prohibited by law." (Articles 94, 95 prescribe the degrees of relationships between whom marriage is prohibited by law, which for instance include first cousins.)
[3] Article 1, Section 3 is titled "Right to Individual Dignity"; it provides:

"No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime." (Italics ours.)
[4] The present widow claims to be the sole heir of her deceased husband, since the adultery-conceived sons were incapable of receiving their father's legacies. Article 1488. Where there is no valid testamentary disposition, a surviving wife succeeds to her husband's estate if there be no lawful descendants, ascendants, or collateral relations of the decedent. Article 917. However, if the present illegitimates had not been conceived of an adultery, the testamentary disposition to them of the decedent's separate estate is permitted by our code, despite the existence of a surviving widow. Articles 1483, 1486, 1487.
[5] The legislative classification distinguishing adulterous illegitimates from other illegitimates also prevents an adulterous child from inheriting by intestacy, even if there are no other surviving heirs or spouse, Article 920 (unlike other illegitimates, who may inherit by intestacy under these circumstances. Articles 919, 920). In the event the decedent is survived only by adulterous children, their parent's estate escheats to the state. Article 920.
[6] State of Louisiana, Constitutional Convention of 1973, Verbatim Transcripts (39 Volumes; 1973-1974) at 12 Proceedings (38th day, August 29) 57, 62, 63, 76, 90.
[7] If the father had not claimed the sons as his own, no such statutory bar prevented his willing his property to them. The son of a friend may receive a legacy from the decedent, but not his own illegitimate son if (and only if) that son was conceived in an adultery committed with that friend.
[8] In Weber, the United States Supreme Court (reversing our decision at 257 La. 424, 242 So.2d 567 (1970)) invalidated a provision of the Louisiana workmen's compensation act as offending the federal Equal Protection Clause of the Fourteenth Amendment. Our statutory provision prevented an un acknowledged illegitimate child from receiving dependency benefits available to acknowledged illegitimates, as well as to legitimate children. In doing so, the court also noted that article 204 of our Civil Code prevents a father from acknowledging his illegitimate child, if adulterous (as was the Weber claimant), and commented: "The burdens of illegitimacy, already weighty, become doubly so when neither parent nor child can legally lighten them." 406 U.S. 171, 92 S.Ct. 1404.
[9] Under certain limited circumstances, the oath of the mother can also prove paternity. Article 210; McConkey v. Pinto, 305 So.2d 469 (La.1974). We do not regard this possibility as practically applicable where the effect of the mother's oath and other testimony by her (as to information known only by her) would be to accomplish the disinhersion of her child.
[10] But note, for federal equal protection purposes, the United States Supreme Court's recent express modification of Vincent in Trimble v. Gordon, 430 U.S. 763, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977).
[11] In Vincent, the United States Supreme Court itself recognized this contextual limiting circumstance of its ruling: "* * * There is not the slightest suggestion in this case that Louisiana has barred this illegitimate from inheriting from her father. * * *" 401 U.S. 539, 91 S.Ct. 1021.
[12] An Illinois statute which allowed illegitimate children to inherit by intestate succession only from their mothers was invalidated as denying equal protection to an illegitimate who sought recognition as an intestate heir of her father.
[13] A provision of the Louisiana workmen's compensation act was invalidated as denying equal protection to an un acknowledged illegitimate child, where acknowledged illegitimates were permitted to receive dependency benefits.